**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Timothy Walker, individually and on behalf of all others similarly situated, | |
| | Case No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| Keurig Dr Pepper Inc., | |
| Defendant. | |

Plaintiff Timothy Walker ("Plaintiff") brings this Class Action Complaint against Defendant Keurig Dr Pepper Inc. ("Nantucket Nectars" or "Defendant"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

**NATURE OF THE ACTION**

1.     Plaintiff brings this important consumer Class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant's Orchard Apple Nantucket Nectar drink (the "Product"), which is unfit for human consumption because the packaging in which they are contained—and is essential and integral to delivering the Product to the consuming public—contains unsafe short chain per- and polyfluoralkyl substances ("PFAS").

2.     PFAS are a group of synthetic, man-made, chemicals known to be harmful to both the environment and humans.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects

1

in laboratory studies and have been associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies."[1]

3.      In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health.  Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[2]

4.       Despite Defendant's representations to consumers that its Product is "safe" and contains "all natural ingredients," including in its website and the Product packaging—which is an essential and integral part of delivering the Product to consumers—independent research conducted by Plaintiff's counsel determined that the Product packaging contains 123 ng/L of 1H,1H, 2H, 2H-Perfluorooctane sulfonic acid."[3]  Therefore, per Plaintiff's testing results, the Product is not "safe" nor contain "all natural ingredients".

5.      Until June 2022, the EPA health advisor limit for safe consumption, on the other hand, was just **70 nanograms per liter**—almost half the levels found in the Product.[4]  Since then, the limit has been drastically lowered.  Accordingly, the Product would expose a consumer to levels of PFAS **orders of magnitude** greater than one would receive from drinking a liter of water that contains PFAS at the maximum level considered safe by the EPA.

---

[1] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," Environ. Sci. Technol. 2022, 56, 1162-1173, 1162.

[2] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-healthrisks-underestimated/ (last visited Aug. 15, 2022).

[3] According to Toxin Free USA, "organic fluorine results identify a quantity of organofluorine compounds (e.g., PFAS) and excludes the possibility that fluorine may be present from other or natural sources." *See GMO Free v. CoverGirl Cosmetics, et al.*, Case No. 2021-CV-0046786B (D.C. Super. Dec. 20, 2021), Docket No. 1, ¶¶ 30-31.

[4] *See* https://www.awwa.org/LinkClick.aspx?fileticket=Q3AuGUndFUA%3D&portalid=0 (last visited Aug. 15, 2022).

6.      Thus, the Product is not safe and does not contain "all natural ingredients," and poses a significant health risk to unsuspecting consumers.  In contrast, based Defendant's representations, a reasonable consumer would expect that the Product can be safely purchased and consumed as marketed and sold.  Yet neither before nor at the time of purchase does Defendant notify consumers like Plaintiff that their Product is unsafe and harmful, contains heightened levels of PFAS, or should otherwise be approached with caution.

7.      Accordingly, Plaintiff brings his claims against Defendant individually and on behalf of a Class of all other similarly situated for (1) violation of New York Gen. Bus. Law § 349, *et seq.*; (2) violation of New York Gen. Bus. Law § 350, *et seq.*; (3) breach of express warranty; (4) fraud; (5) constructive fraud; and (6) unjust enrichment.

## PARTIES

### A.  Plaintiff

8.      Plaintiff Timothy Walker is a resident of East Rockaway, New York, and was, at all times relevant hereto, a citizen of New York.

### B.  Defendant

9.      Defendant Keurig Dr Pepper Inc. is a publicly traded multinational beverage company incorporated in Delaware and headquartered in Burlington, Massachusetts.  Keurig Dr Pepper Inc. is listed on the NASDAQ (KDP), employs over 25,000 workers, and boasts more than $10 billion in annual sales revenue and a $54 billion market cap.

10.     Today, Defendant owns, formulates, produces, advertises, distributes, and sells more than 30 brands throughout the United States and the world, including the brand at issue in this case, Nantucket Nectars.[5]

---

[5] *Available at* https://www.keurigdrpepper.com/en/our-brands/product-facts-brands (last visited Jul. 31, 2022).

3

## JURISDCTION AND VENUE

11.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more proposed Class

Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest

and costs, and (iii) there is minimal diversity because a Plaintiff and Defendant are citizens of

different states.

12.     This Court has personal jurisdiction over the Defendant because the company

transacts business in this State and District, has substantial aggregate contacts with this State and

District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and

intended effect of causing injury to persons in this State and District, and because it purposefully

availed itself of the laws of the State of New York, and further because Plaintiff purchased the

Product in this State and District.

13.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a

substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, including

Plaintiff's purchase of the product, because Defendant transacts substantial business in this

District, and because Defendant has intentionally availed itself of the laws and markets within this

District.

## FACTUAL ALLEGATIONS

### A.  Food Safety and Consumer Preferences

14.     According to a recent survey, chemicals in food (including carcinogens or cancer-

causing chemicals) represents the most important food safety issue to consumers.[6]  Consumers

---

[6] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-topfood-safety-concern-among-consumers/ (last visited Aug. 12, 2021).

ranked this concern more highly than any other concern, including foodborne illness from bacteria and use of pesticides.[7]

15.    At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.  One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[8]

16.    These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[9]

17.    Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[10]

**B.  Defendant's Misrepresentations to Consumers**

18.    Thus, there is enormous incentive for companies such as Defendant to cultivate an ethical, health-minded corporate image and market their products as safe and natural. Indeed, Defendant touts these considerations as reasons to purchase the Product over competitors.

19.    For instance, Defendant prominently displays the statement on Nantucket Nectars' branding that they contain "All Natural Ingredients." [11]

---

[7] *Id.*

[8] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wpconent/uploads/2017/07/What-Shoppers-Want.pdf (last visited Aug. 12, 2022).

[9] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-thegame-for-food-beverage-processors/ (last visited Aug. 12, 2022).

[10] Made Safe, "What Shoppers Want," at 3.

[11] *Available at* https://www.kdpproductfacts.com/product/a0e3h000003LK4DAAW/nantucket-nectars-orchard-apple-juice-159-fl-oz-us (last visited Aug. 10, 2022).



20.    The "all natural ingredients" representation is made boldly and conspicuously on the front of the Product's label to ensure that consumers and Plaintiff and Class Members relied upon such representation.

21.    In addition to the "all natural ingredients" claim, Defendant further bolsters its natural image with a short and sweet ingredient list, listing just 3 ingredients:[12]

---

[12] *Available at* https://www.instacart.com/image-server/466x466/www.instacart.com/assets/domains/product-image/file/large_179e2e26-3036-4878-b26f-09b153192837.png (last visited Aug. 15, 2022).

FILTERED WATER, APPLE JUICE CONCENTRATE, NATURAL FLAVORS.

22.     Defendant also carefully cultivates its own corporate image, describing itself on its own website as "a leading producer and distributor of hot and cold beverages to satisfy every consumer need, anytime and anywhere."[13]   According to Defendant, "[w]e're committed to sourcing, producing and distributing our beverages responsibly, while ensuring we make a positive impact on our customers, employees, communities and planet."[14]

23.     Despite Defendant's prominent "all natural ingredients" branding, however, and despite its 3-item ingredient list on the Product's bottle, and despite the company's supposed "commit[ment] to sourcing, producing and distributing [its] beverages responsibly," Defendant systematically produced, distributed, and sold a Product with orders of magnitude higher PFAS levels than the maximum safe PFAS level.

**C. The Dangers of PFAS, and the Product's Dangerously High PFAS Levels**

24.     PFAS are a kind of man-made "forever chemical," which according to the EPA "break down very slowly over time."[15]   The EPA further advises that "[s]cientific studies have shown that exposure to some PFAS in the environment may be linked to harmful health effects in humans and animals."[16]

---

[13] *Available at* https://www.keurigdrpepper.com/ (last visited Aug. 12, 2022).

[14] *Available at* https://www.keurigdrpepper.com/en/our-company/corporate-responsibility (last visited Aug. 12, 2022).

[15] *Available at* https://www.epa.gov/pfas/pfas-explained (last visted Aug. 12, 2022).

[16] *Id.*

25.     Historically, the EPA has managed the concern around the dangers of PFAS compounds with our legitimate uncertainty about them, recommending PFAS levels in drinking water no greater than 70 nanograms per Liter.  The 2022 EPA Health Advisories, however, reflects a growing understanding of the dangers posed by PFAS compounds, drastically reducing that threshold to 0.004 nanograms per Liter for PFOA compounds (one kind of PFAS) and 0.02 nanograms per Liter for PFOS compounds (another kind of PFAS).  Numerous state regulatory bodies have similarly heightened standards well beyond the previous 70 nanogram per Liter standard.[17]

26.     Plaintiff's independent testing of the Product, however, revealed 1H,1H, 2H, 2H-Perfluorooctane sulfonic acid (a kind of PFOA) levels of **123 ng/L**.  This is nearly double the EPA's prior guideline threshold and **orders of magnitude** greater than the current guidelines allow.

27.     That these substances are harmful to the human body is beyond dispute. In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[18]

---

[17] For example, New York limits PFOA levels to 0.01 ng/L, (https://www.health.ny.gov/environmental/water/drinking/docs/water_supplier_fact_sheet_new_mcls.pdf), New Jersey limits PFOA levels to 14 ng/L, (https://www.nj.gov/dep/pfas/2022-epa.html), and Massachusetts sets its maximum contamination level to 20 ng/L (https://www.mass.gov/info-details/per-and-polyfluoroalkyl-substances-pfas).

[18] Environmental Protection Agency, PFAS Explained, https://www.epa.gov/pfas/pfas-explained (last visited Aug. 15, 2022).

28.     The Centers for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[19]

29.     The EPA has identified that "[c]urrent peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:"[20]

a.  Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.

b.  Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.

c.  Increased risk of some cancers, including prostate, kidney, and testicular cancers.

d.  Reduced ability of the body's immune system to fight infections, including
e.  reduced vaccine response.

f.  Interference with the body's natural hormones.

g.  Increased cholesterol levels and/or risk of obesity.

30.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[21]

---

[19] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS," https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed Aug. 15, 2022).

[20] https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas
[21] *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021) https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.



31.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[22]

32.     The danger of PFAS chemicals is well known.  On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies", reported on the dangers of PFAS—particularly during gestation and in early childhood development:[23]

---

[22] *Id.*
[23] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, NEW YORK TIMES (Sept. 23, 2020, updated Oct. 18, 2021) https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.

33.     Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.[24]

34.     This analysis has yet to be performed in the United States; however, there is no reason to believe the conclusions would differ.

35.     Specifically, the Product contains above trace amounts of 1H,1H, 2H, 2H-Perfluorooctane sulfonic acid.   Perfluorooctane sulfonic acid is associated with a number of harmful effects.

36.     In fact, companies have recommended the labels on products that contain Perfluorooctane sulfonic acid to warn users about its harmful and dangerous effect if it came into human contact.[25]

---

[24] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html
[25] https://www.sigmaaldrich.com/US/en/life-science/safety/hazard-and-precautionary-statements#hazard (last visited August 16, 2022).

| Description | Pictogram | Hazard class and hazard category: |
|---|---|---|
| Exploding Bomb<br>GHS01 |  | Unstable explosives<br>Explosives of Divisions 1.1, 1.2, 1.3, 1.4<br>Self reactive substances and mixtures, Types A,B<br>Organic peroxides, Types A,B<br>Fire or projection hazard Division 1.5<br>May mass explode in fire Division 1.6 |
| Flame<br>GHS02 |  | Flammable gases, category 1<br>Flammable aerosols, categories 1,2<br>Flammable liquids, categories 1,2,3<br>Flammable solids, categories 1,2<br>Self-reactive substances and mixtures, Types B,C,D,E,F<br>Pyrophoric liquids, category 1<br>Pyrophoric solids, category 1<br>Self-heating substances and mixtures, categories 1,2<br>Substances and mixtures, which in contact with water, emit flammable gases, categories 1,2,3<br>Organic peroxides, Types B,C,D,E,F |
| Flame Over Circle<br>GHS03 |  | Oxidizing gases, category 1<br>Oxidizing liquids, categories 1,2,3 |
| Gas Cylinder<br>GHS04 |  | Gases under pressure:<br>- Compressed gases<br>- Liquefied gases<br>- Refrigerated liquefied gases<br>- Dissolved gases |
| Corrosion<br>GHS05 |  | Corrosive to metals, category 1<br>Skin corrosion, categories 1A,1B,1C<br>Serious eye damage, category 1 |
| Skull and Crossbones<br>GHS06 |  | Acute toxicity (oral, dermal, inhalation), categories 1,2,3 |
| Exclamation Mark<br>GHS07 |  | Acute toxicity (oral, dermal, inhalation), category 4<br>Skin irritation, category 2<br>Eye irritation, category 2<br>Skin sensitisation, category 1<br>Specific Target Organ Toxicity – Single exposure, category 3 |
| Health Hazard<br>GHS08 |  | Respiratory sensitization, category 1<br>Germ cell mutagenicity, categories 1A,1B,2<br>Carcinogenicity, categories 1A,1B,2<br>Reproductive toxicity, categories 1A,1B,2<br>Specific Target Organ Toxicity – Single exposure, categories 1,2<br>Specific Target Organ Toxicity – Repeated exposure, categories 1,2<br>Aspiration Hazard, category 1 |
| Environment<br>GHS09 |  | Hazardous to the aquatic environment<br>- Acute hazard, category1<br>- Chronic hazard, categories 1,2 |

37.     Therefore, companies have associated Perfluorooctane sulfonic acid with warnings it can cause injuries such as "acute toxicity," "skin irritation," "eye irritation," "specific target organ toxicity," "carcinogenicity," "reproductive toxicity," and "aspiration hazard."

38.     Food and beverages contaminated with PFAS are likely the result of food packaging created with PFAS.

39.     Why would companies use such dangerous compounds in packaging for food and drinks?  The reason is simple: the coating acts "as a barrier to keep grease from escaping" and "from leaking into people's hands.[26]  In other words, the companies trade off consumer health for convenience, hoping consumers will notice the increased convenience but not notice the deleterious health effects.

40.     But PFAS are not necessary for this intended outcome. Indeed, numerous food and beverage products on the market contain no detectable levels of PFAS.  Accordingly, Defendant would have had knowledge that it could produce the Product packaging without the heightened levels of PFAS inherent in its current composition.

41.     Yet, Defendant chose not to, and instead concealed this information from consumers, including Plaintiff and the proposed Class, to pad its bottom line and pass the costs (in the form of adverse health effects) onto its trusting customers.

42.     As a result, consumers unknowingly purchased the Product containing dangerously high levels of PFAS and ingested the Product, thus exposing them to a risk of bodily harm.

---

[26] Iowa State University, "New study calls for mitigation, monitoring of common grease-proofing food packaging chemicals," News Service (Oct. 19, 2021), https://www.news.iastate.edu/news/2021/10/19/pfas2021 (last visited Aug. 15, 2022).

**D.  Defendant's Misrepresentations and Omissions Harmed Consumers**

43.    As discussed above, Defendant's Product's short ingredient list glaringly omits the presence of PFAS.  This omission deprives Plaintiff and proposed Class Members of the basis of their bargain for the Product.

44.    No reasonable consumer would expect a product without potentially dangerous chemicals listed in its ingredient list to contain those chemicals, and no reasonable consumer would expect a product marketed as containing "all natural ingredients" would contain dangerous man-made chemicals.

45.    Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is natural, especially at the point of sale.  Consumers would not know the true nature of the ingredients merely by reading the ingredients label.

46.    Discovering that the ingredients are not natural and are actually synthetic requires a scientific investigation and knowledge of chemistry beyond that of the average consumer.  This is why Defendant's representations to consumers, including a comprehensive list of ingredients and explicit representations such as "all natural ingredients" are so critical to consumers' decisions.

47.    Defendant did not disclose that the Product contains dangerous levels of PFAS. Defendant also went further, representing that the Product contained "all natural ingredients," which a reasonable consumer understands to mean that the Product is natural and does not contain synthetic ingredients, and in particular harmful synthetic ingredients.

48.    Defendant has thus violated, *inter alia*,  NY General Business Law § 392-b by: a) putting upon an article of merchandise, bottle, wrapper, package, label, or other thing containing or covering such an article, or with which such an article is intended to be sold, or is sold, a false description or other indication of or respecting the kind of such article or any part thereof; and b)

14

selling or offering for sale an article which, to its knowledge, is falsely described or indicated upon any such package or vessel containing the same, or label thereupon, in any of the particulars specified.

49.     Consumers rely on label representations and information in making purchasing decisions.

50.     The marketing of the Product as containing "all natural ingredients" in a prominent location on the Product's label, throughout the Class Period, evidences Defendant's awareness that natural claims are material to consumers.  The marketing of the Product to omit the fact that it contains dangerous levels of PFAS, through the Class Period, evidences Defendant's awareness that consumers avoid food and drinks that contain such harmful substances.

51.     Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

52.     Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

53.     Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the Class Members.

54.     In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products labeled as being "all natural ingredients" over comparable products not so labeled.  Furthermore, Defendant knew that its Product would be worth less, if anything at all, if it accurately included PFAS in the ingredient list, as required by law.

55.    As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiff and the Class Members in that they:

- Paid a sum of money for a Product that was not what Defendant represented;

- Paid a premium price for a Product that was not what Defendant represented;

- Were deprived of the benefit of the bargain because the Product they purchased was different from what Defendant warranted;

- Were deprived of the benefit of the bargain because the Product they purchased had less value than what Defendant represented;

- Ingested a substance that was of a different quality than what Defendant promised; and

- Were denied the benefit of the beneficial properties of the natural supplement Defendant promised.

56.    Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Product they purchased, if they would have been willing to purchase it at all.

57.    Plaintiff and the Class Members paid for a Product that contain "all natural ingredients" and that do not contain PFAS but received a Product that is not all natural, with PFAS levels nearly *twice* the maximum safe level for human consumption.  The Product Plaintiff and the Class Members received was thus worth less than the Product for which they paid.

58.    Plaintiff and the Class Members all paid money for the Product; however, Plaintiff and the Class Members did not obtain the full value of the advertised Product due to Defendant's misrepresentations and omissions.  Plaintiff and the Class Members purchased, purchased more of, and/or paid more for the Product than they would have had they known the truth about the

Product.  Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

## PLAINTIFF'S FACTUAL ALLEGATIONS

59.   Plaintiff, Timothy Walker, is a citizen and resident of the state of New York.  During the applicable statute of limitations period, Plaintiff purchased and consumed Defendant's Products that contained PFAS.  More specifically, during the class period Plaintiff purchased Defendant's Products numerous times at various retail stores in Nassau County, NY.  Plaintiff purchased various different flavors, including the apple flavor version of the Product.

60.   Prior to his purchase, Plaintiff reviewed the labeling, packaging, and marketing materials of her Product, including those set out herein.  Thus, Plaintiff understood that based on Defendant's claims, the Product was safe for use and contained "all natural ingredients," and thus was free of harmful chemicals like PFASs.  Plaintiff reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that he would not have purchased the Product, or would not have purchased it on the same terms, if the true facts had been known.

61.   As a direct result of Defendant's material misrepresentations and omissions, Plaintiff suffered and continues to suffer, economic injuries.

62.   Plaintiff continues to desire to purchase the Product from Defendant if he can rely on that Product to be sustainable and safe.  However, concerned about the health and environmental consequences of PFAS and Defendant's misrepresentations detailed herein, Plaintiff is unable to determine if Defendant's Product is actually all natural and free of harmful chemicals like PFAS in the future.  Plaintiff understands that the composition of the Product may change over time, but as long as Defendant may freely advertise the Product as safe when it actually contains dangerously heightened levels of PFAS, then when presented with false or

misleading information when shopping, he will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and competitor's products, which *are* in fact all natural and free of PFAS.

## CLASS ACTION ALLEGATIONS

63.    Plaintiff brings this action individually and as the representative of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined Classes:

> **National Class**: During the fullest period allowed by law, all persons who purchased the Product within the United States for personal use and not for resale.

> **New York Subclass**: During the fullest period allowed by law, all persons who purchased the Product within the State of New York for personal use and not for resale.

64.    Members of the classes described are referred to herein as "Class Members" or members of the "Class."

65.    Plaintiff reserves the right to amend the Class definitions or add a Class or Classes if discovery and/or further investigation reveal that the Class definition(s) should be narrowed, expanded or otherwise modified.

66.    The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been

finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

67.     **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: While Plaintiff does not know at this time the exact number of proposed Class Members, given the nature of the claims and the volume of sales of the Product nationally, the members of the Class are so numerous that their individual joinder herein is impracticable.  Plaintiff is informed and believes that there are tens of thousands of members in the proposed Class, if not more, and a precise number can be ascertained through discovery. The number of individuals who comprise the Class are so numerous that the disposition of all such person's claims in a class action, rather than in individual actions, will benefit both the parties and the courts.

68.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, but are not limited to, the following:

a.     Whether Defendant misrepresented, omitted, and/or failed to disclose material facts concerning the Product;

b.     Whether Defendant's conduct was unlawful; unfair; fraudulent and/or deceptive;

c.     Whether Defendant breached express warranties to Plaintiff and Class Members;

d.     Whether Defendant was unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the proposed Class;

e.     Whether Plaintiff and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

Defendant engaged in a common course of conduct giving rise to the legal rights Plaintiff seeks to enforce on behalf of himself and the other Members of the proposed Class. Similar or

identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

**Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are typical of the claims of the other Members of the Class because, among other things, all Members of the Class were comparably injured through Defendant's uniform misconduct described herein. Further, there are no defenses available to Defendant that are unique to Plaintiff or to any particular Members of the Class.

**Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Members of the Class he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and he will prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and the undersigned counsel.

**Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Class would continue to suffer the harm described herein, for which they would have no remedy.  Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.  The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

69.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no

unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Members of the Class to individually seek redress for Defendant's wrongful conduct. Even if Members of the Class could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### Violation Of Magnuson-Moss Warranty Act
### 15 U.S.C. § 2301, *et seq.*
### (On Behalf of Plaintiff and the National Class and Alternatively the New York Subclass)

70.    Plaintiff repeats and re-allege all previous paragraphs, as if fully included herein.

71.    As previously alleged, this Court has original jurisdiction over this matter based upon the requirements of CAFA; therefore, the Court has alternate jurisdiction over Plaintiff's Magnuson-Moss claim.

72.    The Product is a consumer product as defined in 15 U.S.C. § 2301(1).

73.    Plaintiff and the National Class members are consumers as defined in 15 U.S.C. § 2301(3) and utilized the Product for personal and household use and not for resale or commercial purposes.

74.    Plaintiff purchased the Product costing more than $5 and their individual claim is greater than $25 as required by 15 U.S.C. §§ 2302(e) and 2310(d)(3)(A).

75.     Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

76.     The federal Magnuson-Moss Warranty Act ("MMWA" or "Act"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.

77.     The MMWA provides a cause of action for breach of warranty, including the violation of express and implied warranty of merchantability, or other violations of the Act. 15 U.S.C. § 2310(d)(1).

78.     The Defendant has the implied warranties of merchantability by failing to provide merchantable goods. The Product at issue are not merchantable or fit for their ordinary purposes because the Product contains ingredients that render the Products as not containing "all natural ingredients".

79.     Therefore, Defendant's Products are not merchantable or fit for their ordinary purposes because it does not contain "all natural ingredients" given it contains man-made and synthetic PFAS.

80.     Defendant violated the express warranty because despite claiming it contains "all natural ingredients", it does not contain all natural ingredients because it contains a non-trace amount of PFAS chemicals that renders the Product not all natural. Hence, it breached the express warranty by making said representation.

81.     In its capacity as warrantor, and by the conduct described herein, any attempt by Defendant to limit the warranties in a manner that it does is not permitted by law.

82.     By Defendant's conduct as described herein, Defendant has failed to comply with its obligations under its implied promises, warranties, and representations.

83.     Plaintiff and the National Class fulfilled their obligations under the implied warranties and express warranties for the Products.

84.     As a result of Defendant's breach of warranties, Plaintiff and the National Class are entitled to revoke their acceptance of the Products, obtain damages, punitive damages, equitable relief, and attorneys' fees and costs pursuant to 15 U.S.C. § 2301.

**COUNT II**
**Violation of the New York Deceptive Trade Practices Act,**
**New York Gen. Bus. Law § 349, *et seq.***
**(Plaintiff on behalf of the New York Subclass)**

85.     Plaintiff repeats and re-alleges the allegations above as if set forth herein.

86.     The New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

87.     Defendant misleadingly, inaccurately, and deceptively advertise and market their Product to consumers.

88.     Defendant's improper consumer-oriented conduct—including labeling and advertising the Product as containing "all natural ingredients" —is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendant's Product and to use the Product when they otherwise would not have. Defendant made its untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

89.     Plaintiff and the New York Subclass Members have been injured inasmuch as they paid a premium for a Product that was—contrary to Defendant's representations— not natural and did contain dangerous levels of PFAS. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

90.     Defendant's advertising and Product's packaging and labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Product and to pay a premium price.

91.     Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

92.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

93.     In addition, Plaintiff and Class Members seek equitable and injunctive relief against Defendant on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

Finally, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

<u>**COUNT III**</u>
**Violation of the New York Deceptive Trade Practice Act,**
**New York Gen. Bus. Law § 350, *et seq.***
**(Plaintiff on behalf of the New York Subclass)**

94.     Plaintiff repeats and re-alleges the allegations above as if set forth herein.

95.     The N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

96.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

97.    Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions concerning Defendant's Product inasmuch as they misrepresent that the Product contains "all natural ingredients" and is free of PFAS.

98.    Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Product which were—contrary to Defendant's representations—not natural and did contain dangerous levels of PFAS.  Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

99.    Defendant's advertising, packaging, and Product's labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Product.

100.    Defendant made its untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

101.    Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

102.    Defendant made the material misrepresentations described in this Complaint in Defendant's advertising and on the Product's packaging and labeling.

103.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Product were and continue to be exposed to Defendant's material misrepresentations.

104.    As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

In addition, Plaintiff and Class Members seek equitable and injunctive relief against Defendant on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

105.    Finally, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT IV
### Breach of Express Warranty
### (Plaintiff on Behalf of the Class)

106.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

107.    At Plaintiff and Class Members formed a contract with Defendant at the time Plaintiff and Class Members purchased the Product.

108.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Product packaging and through marketing and advertising, as described above.

109.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and Class Members.

110.    As set forth above, Defendant purport through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for consumption and contains "all natural ingredients."

111.    The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

112.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiff's and Class Members' decision to purchase the Product.

113.    Plaintiff and Class Members reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendant's Product.

114.    Plaintiff and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Product.

115.    Defendant thereby breached the following state warranty laws:

    a.      Code of Ala. § 7-2-313;

    b.      Alaska Stat. § 45.02.313;

    c.      A.R.S. § 47-2313;

    d.      A.C.A. § 4-2-313;

    e.      Cal. Comm. Code § 2313;

    f.      Colo. Rev. Stat. § 4-2-313;

    g.      Conn. Gen. Stat. § 42a-2-313;

    h.      6 Del. C. § 2-313;

    i.      D.C. Code § 28:2-313;

    j.      Fla. Stat. § 672.313;

    k.      O.C.G.A. § 11-2-313;

    l.      H.R.S. § 490:2-313;

    m.      Idaho Code § 28-2-313;

    n.      810 I.L.C.S. 5/2-313;

    o.      Ind. Code § 26-1-2-313;

    p.      Iowa Code § 554.2313;

    q.      K.S.A. § 84-2-313;

r.     K.R.S. § 355.2-313;

s.     11 M.R.S. § 2-313;

t.     Md. Commercial Law Code Ann. § 2-313;

u.     106 Mass. Gen. Laws Ann. § 2-313;

v.     M.C.L.S. § 440.2313;

w.     Minn. Stat. § 336.2-313;

x.     Miss. Code Ann. § 75-2-313;

y.     R.S. Mo. § 400.2-313;

z.     Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.     R.S.A. 382-A:2-313;

dd.     N.J. Stat. Ann. § 12A:2-313;

ee.     N.M. Stat. Ann. § 55-2-313;

ff.     N.Y. U.C.C. Law § 2-313;

gg.     N.C. Gen. Stat. § 25-2-313;

hh.     N.D. Cent. Code § 41-02-30;

ii.     II. O.R.C. Ann. § 1302.26;

jj.     12A Okl. St. § 2-313;

kk.     Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.     R.I. Gen. Laws § 6A-2-313;

nn.     S.C. Code Ann. § 36-2-313;

    oo.    S.D. Codified Laws, § 57A-2-313;

    pp.    Tenn. Code Ann. § 47-2-313;

    qq.    Tex. Bus. & Com. Code § 2.313;

    rr.    Utah Code Ann. § 70A-2-313;

    ss.    9A V.S.A. § 2-313;

    tt.    Va. Code Ann. § 59.1-504.2;

    uu.    Wash. Rev. Code Ann. § 6A.2-313;

    vv.    W. Va. Code § 46-2-313;

    ww.    Wis. Stat. § 402.313; and

    xx.    Wyo. Stat. § 34.1-2-313.

116.    Within a reasonable time after knowing of Defendant's breach, Plaintiff, on behalf of himself and Class Members, placed Defendant on notice of its breach, giving Defendant an opportunity to cure its breach, which it refused to do.  The letter, dated August 31, 2022, indicated, among other things, that Defendant was engaging in deceptive acts and practices by falsely warranting that its Product contained "all natural ingredients," when in fact they were not natural, and by falsely omitting that its Product contained dangerous levels of PFAS.

### COUNT V
### Fraud
### (Plaintiff On Behalf of the Class)

117.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

118.    At the time Plaintiff and Class Members purchased the Product, Defendant did not disclose, but instead concealed and misrepresented, the Product as safe.

119.    Defendant affirmatively misrepresented the nature and quality of the Product, giving the Product the appearance of being all natural and safe for human consumption.

120.    Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

121.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Product.

122.    Plaintiff and Class Members were reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

123.    Plaintiff and Class Members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained exclusive control over knowledge of the true quality of the Product.

124.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

125.    Additionally, as a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## COUNT VI
### Constructive Fraud
### (Plaintiff On Behalf of the Class)

126.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

127.    At the time Plaintiff and Class Members purchased the Product, Defendant falsely claimed the Product contained "all natural ingredients" and did not disclose that the Product contains dangerous levels of PFAS.

128.    Defendant affirmatively misrepresented the nature of the Product, giving the Product the appearance of being natural and safe for human consumption.

129.    Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

130.    Defendant had an obligation not to omit or misrepresent the Product because in addition to the fact that the Product pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Product; (c) Plaintiff and the Class Members relied upon Defendant to make full disclosures based upon the relationship between Plaintiff and Class Members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

131.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature and quality of the Product.

132.    Plaintiff and Class Members were reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

133.    152. Plaintiff and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained exclusive control over knowledge of the true quality of the Product, and what information was available regarding the Product.

134.    Defendant breached its duty to Plaintiff and Class Members to make full disclosures of the safety of their Product.

135.    Plaintiff and Class Members sustained actual losses and damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, in a sum to be determined at trial.

**COUNT VII**
**Unjust Enrichment**
**(In the Alternative and on Behalf of the Class)**

136.     Plaintiff repeats and re-alleges the allegations above as if set forth herein.

137.     At all relevant times, Defendant were responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Product and its packaging. At all relevant times, it was reasonably foreseeable by Defendant that the use of the Product in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Product.

138.     At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiff and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

139.     Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Product, had a duty to warn Plaintiff and the Class of all dangers associated with consumption of the Product.

140.     At minimum, the duty arose for Defendant to warn consumers that use of the Product could result in injury and was unreasonably dangerous.

141.     Defendant have been unjustly enriched in retaining the revenues derived from the purchases of the Product by Plaintiff and the other members of the Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendant's representations regarding the quality or value of the Product were misleading to consumers, which caused injuries to Plaintiff and the other members of the Class, because they would have not purchased the Product had they known the truth or would only have purchased the Product for a lower price.

32

142.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and the other members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the other members of the Class for its unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated members of the Class, prays for relief and judgment, including entry of an order, as follows:

(a) Declaring that this action is properly maintained as a class action, certifying the proposed Class, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

(b) Directing that Defendant bear the costs of any notice sent to the Class;

(c) Ordering Defendant to pay restitution to Plaintiff and the Class;

(d) A jury trial and damages according to proof;

(e) Awarding actual damages to Plaintiff and the Class;

(f) Awarding Plaintiff and members of the Class statutory damages, as provided by the applicable state consumer protection statutes invoked above;

(g) Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class;

(h) Civil penalties, prejudgment interest and punitive damages as permitted by law; and

(i) Ordering such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial of the claims asserted in this Class Action Complaint.

Dated: September 16, 2022

Respectfully submitted,

By: **THE SULTZER LAW GROUP P.C.**

Jason P. Sultzer /s/

By: _____

Jason P. Sultzer, Esq.
Daniel Markowitz, Esq.
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
Nick Suciu III*
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
Gary Klinger*
221 West Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
Russell Busch (6329500)
J. Hunter Bryson*
Zoe T. Aaron*
405 E 50th Street
New York, NY 10022
Tel: (630) 796-0903
rbusch@milberg.com
hbryson@milberg.com
zaaron@milberg.com

* *Pro Hac Vice* application forthcoming

*Attorneys for Plaintiff and the Proposed
Class*

35